IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HELSINN HEALTHCARE S.A. and ROCHE PALO ALTO LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. 13-688 (GMS) CONSOLIDATED |
| AUROBINDO PHARMA LTD. and AUROMEDICS PHARMA LLC, | ) ) ) ) | |
| Defendants. | ) | |
| HELSINN HEALTHCARE S.A. and ROCHE PALO ALTO LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. 13-1612 (GMS) |
| BEN VENUE LABORATORIES, INC. d/b/a BEDFORD LABORATORIES | ) ) ) | |
| Defendant. | ) ) | |

## PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Joseph M. O'Malley, Jr.
Bruce M. Wexler
Eric W. Dittmann
David M. Conca
Gary Ji
Angela C. Ni
PAUL HASTINGS LLP
75 East 55th Street
New York, NY 10022
(212) 318-6000

*Attorneys for Plaintiff*
*Helsinn Healthcare S.A.*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Plaintiffs Helsinn Healthcare*
*S.A. and Roche Palo Alto LLC*

Mark E. Waddell
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
(212) 407-4127

*Attorneys for Plaintiff*
*Roche Palo Alto LLC*

April 17, 2014

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................. 3

THE LAW OF CLAIM CONSTRUCTION ................................................................ 6

ARGUMENT ...................................................................................................... 8

I.      A CONSTRUCTION OF "PLAIN MEANING" IS SUFFICIENT ................................... 8

II.     TO THE EXTENT THE COURT DETERMINES THAT THE PLAIN
        MEANING REQUIRES ELUCIDATION, ONLY PLAINTIFFS'
        DEFINITION IS CONSISTENT WITH THE SPECIFICATION ..................................... 9

        A.      The Specification Supports Plaintiffs' Definition of "Pharmaceutically
                Stable" ................................................................................................... 9

        B.      Ben Venue's Proposed Construction Should be Rejected ..................................... 11

                1.      Ben Venue's Proposed Construction Is Not Supported by the
                        Specification ............................................................................. 11

                2.      Ben Venue's Proposed Construction Is Impermissibly Indefinite ............ 12

III.    THE PROSECUTION HISTORIES OF THE  PATENTS-IN-SUIT ARE
        CONSISTENT WITH THE PLAIN MEANING OF
        "PHARMACEUTICALLY STABLE" .................................................................... 13

IV.     TO THE EXTENT EXTRINSIC EVIDENCE IS CONSIDERED, IT FULLY
        SUPPORTS PLAINTIFFS' POSITION .................................................................. 14

CONCLUSION .................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Finjan, Inc. v. Secure Computing Corp.*,
    No. 06-369, 2007 U.S. Dist. LEXIS 100215 (D. Del. Dec. 11, 2007) .................................7, 9

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
    349 F.3d 1373 (2003).............................................................................................................12

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)............................................................................................12

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.*,
    244 F.3d 1365 (Fed. Cir. 2001)...........................................................................................7, 9

*Netcraft Corp. v. eBay, Inc.*,
    549 F.3d 1394 (Fed. Cir. 2008)............................................................................................10

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)............................................................................................13

*Osram GmbH v. Int'l Trade Comm'n*,
    505 F.3d 1351 (Fed. Cir. 2007)................................................................................7, 9, 10, 11

*Paragon Sol'ns, LLC v. Timex Corp.*,
    566 F.3d 1075 (Fed. Cir. 2009)............................................................................................12

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005).................................................................................... *passim*

*Sciele Pharma Inc. v. Lupin Ltd.*,
    No. 09-0037 (RBK/JS), 2011 WL 4351672 (D. Del. Sept. 15, 2011)......................................8

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    723 F.3d 1363 (Fed. Cir. 2013).............................................................................................6

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)...........................................................................................7, 8

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)..............................................................................................11

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
    200 F.3d 795 (Fed. Cir. 1999)...............................................................................................8

**Statutes**

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ................................................................................................1

35 U.S.C. § 355(j)(5)(B)(iv) .......................................................................................................6

Plaintiffs Helsinn Healthcare S.A. ("Helsinn") and Roche Palo Alto LLC ("Roche") commenced this patent-infringement action under the Hatch-Waxman Act based upon Defendants' respective submissions of Abbreviated New Drug Applications ("ANDAs") to the FDA seeking approval to market generic versions of Plaintiffs' Aloxi® intravenous solutions containing, *inter alia*, the active ingredient palonosetron.[1]  Defendants' ANDAs each contained certifications pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) alleging that Plaintiffs' patents-in-suit covering Aloxi® are invalid and/or not infringed.[2]  In response, Plaintiffs filed a Complaint alleging infringement of each of those patents.  Two other actions involving patents at issue in this action, *Helsinn Healthcare S.A., et al. v. Accord Healthcare, Inc.*, C.A. No. 13-2101 (GMS) and *Helsinn Healthcare S.A., et al. v. Cipla LTD., et al.*, C.A. No. 14-427 (GMS), are also currently before this Court.

In accordance with the Court's Scheduling Order, Plaintiffs submit this claim-construction brief.

## **INTRODUCTION**

Plaintiffs and Ben Venue disagree on the meaning of only one claim term, "pharmaceutically stable," which expressly appears in the claims of all of the patents-in-suit except the '219 patent.[3]  (D.I. 45, 3/27/14 Final Joint Claim Chart (hereinafter "Joint Chart"),

---

[1] "Defendants" refers to Ben Venue Laboratories, Inc. d/b/a Bedford Laboratories ("Ben Venue") and Aurobindo Pharma Ltd. and AuroMedics Pharma LLC (collectively, "Aurobindo").

[2] Those patents are United States Patent Nos. 7,947,724 ("the '724 patent"), 7,947,725, 7,960,424, 8,518,981, and 8,598,218, and 8,598,219 ("the '219 patent") (collectively, "the patents-in-suit").

[3] All intrinsic evidence relied upon in the claim-construction briefing, including the patents and prosecution history documents, will be submitted in the Joint Appendix pursuant to the Court's Scheduling Order.  (D.I. 26 at 2.)

at 1.)  The other defendant in this consolidated action, Aurobindo, has not proposed any construction for this claim term.

While Plaintiffs and Ben Venue agree that "pharmaceutically stable" should be given its "plain meaning," they have proposed widely differing constructions.  Ultimately, the Court should adopt Plaintiffs' proposed construction, "shelf stable for periods greater than 24 months at room temperature," because it is "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc).

The description of the invention in the patents-in-suit is clear; the specification repeatedly describes the "present invention" as "shelf-stable" palonosetron solutions for reducing emesis. (*See, e.g.*,'724 patent, at Abstract, col. 1:12-14.)[4]  Through optimal combinations of palonosetron amounts, excipients, and/or processing steps, this invention overcame the problem (known only to the inventors based upon their confidential research) of the prior-art palonosetron formulations — unacceptable shelf stability.  (*Id.* at col. 1:54-2:3.)  Unlike the prior-art formulations, the new "pharmaceutically stable" formulations claimed in the patents-in-suit met the stability requirements of "health authorities in various countries" and were comparable to other 5-HT$_3$ antagonists known at the time to be, *inter alia*, "shelf stable for periods greater than 24 months at room temperature."  (*Id.* at "SUMMARY OF THE INVENTION," col. 2:59-60.)

Ben Venue's alleged "plain-meaning" construction, "without significant change in chemical and physical integrity for pharmaceutical use," is vague and creates new legal issues, instead of resolving them.  By providing a generic dictionary definition of "stable" and simply

---

[4] The patents-in-suit that expressly contain the "pharmaceutically stable" claim term share a common specification and the same priority application.  Therefore, for simplicity, Plaintiffs cite only the '724 patent when referring to this common specification.

adding the words "for pharmaceutical use" at the end, Ben Venue's proposed construction ignores the specification's disclosure and begs the questions, "what is the applicable time frame for such change" and "under what conditions should such change be measured?"  These are questions, however, that the specification has already answered:  To meet the requirements of "health authorities in various countries" and be comparable to other 5-HT$_3$ antagonists known at the time, "[t]hese formulations are shelf stable for periods greater than 24 months at room temperature." (*Id.*)  Because Ben Venue's proposed construction fails to "align[] with the patent's description of the invention," that construction should be rejected in favor of Plaintiffs' proposed construction.

## BACKGROUND

Palonosetron is a serotonin subtype 3 (5-HT$_3$)-receptor antagonist that prevents nausea and vomiting by blocking the attachment of serotonin to this receptor, and thereby preventing the brain from receiving signals that would otherwise trigger a nausea and vomiting response. Palonosetron was developed as an injectable solution by both Helsinn and Roche (through the work of Roche's predecessor, Syntex USA, Inc.), and is marketed in the United States as a formulation with various excipients under the brand name Aloxi®.  Aloxi® is indicated for the prevention of acute and delayed nausea and vomiting associated with initial and repeat courses of moderately emetogenic cancer chemotherapy, as well as the prevention of acute nausea and vomiting associated with initial and repeat courses of highly emetogenic cancer chemotherapy. (Ex. 1,[5] Aloxi® Prescribing Information, at 1.)  Aloxi® is also indicated for the prevention of acute postoperative nausea and vomiting. (*Id.*)

---

[5] "Ex. __" refers to the exhibits attached to the April 17, 2014 Declaration of Dana Weir, submitted herewith.

As an antiemetic, Aloxi® brings significant relief to the lives of chemotherapy and surgical patients who typically experience nausea and vomiting without preventative measures. It has long been recognized that these side effects impose mental and physical suffering on patients that greatly diminish their quality of life, and may lead to non-compliance with their treatment regimens.  (*See, e.g.*, Ex. 2, Laszlo J, *Nausea and Vomiting as Major Complications of Cancer Chemotherapy*, 25 (Suppl. 1) Drugs 1, 1-7 (1983).)  Giving patients Aloxi® can also mitigate a number of major medical consequences typically associated with severe nausea and vomiting, such as esophageal tears, bone fractures, and malnutrition.  (*Id.* at 2-3.)

Aloxi® is a commercial embodiment of the patents-in-suit.  One of the main purposes of those patents was to provide sufficiently stable palonosetron formulations.  According to the specification, "health authorities in various countries" require pharmaceutical formulations with shelf stability of 1-2 years.  ('724 patent, at col. 2:1-3.)  Based upon their confidential research, however, the inventors discovered that developing a suitable pharmaceutical formulation of palonosetron was difficult because of "shelf-stability issues."  (*Id.* at col. 1:52-54.)  For example, the specification explains that the prior-art palonosetron formulations disclosed in Example 13 of U.S. Patent No. 5,202,333 ("the '333 patent"), which contained different amounts of palonosetron and excipients compared to the claimed palonosetron formulations, did not have sufficient shelf stability to meet regulatory standards:

> [F]ormulating palonosetron in liquid formulations has not proven an easy task, typically due to ***shelf-stability issues***. . . .   The formulation [disclosed in the '333 patent] has a pH of 3.7 and a shelf stability of ***less than the 1-2 year time period required by health authorities in various countries***. . . .

(*Id.* at col. 1:52-2:3 (emphases added); *see id.* at col. 2:36-37.)[6]

---

[6] Helsinn also expressly distinguished the '333 patent during the prosecution of the patents-in-suit on the ground that it does not disclose a "pharmaceutically stable" formulation.  (4/6/09

The specification also notes that other 5-HT$_3$ antagonists were known at the time the application leading to the patents-in-suit was filed ('724 patent, at col. 1:24-26), and provides detailed information regarding their clinical indications, trade names, and dosage forms (*id.* at col. 2:4-35). As the above-quoted passage indicates, however, the inventors learned that the prior-art palonosetron formulations of the '333 patent did not compare favorably with these marketed formulations that had shelf stabilities of more than two years.[7]

Thus, before introducing the claimed palonosetron formulations, the specification acknowledges that "there exists a need for a palonosetron formulation with increased stability and thereby increased shelf life." ('724 patent, at col. 2:36-37.) The patentees fulfilled this need for a pharmaceutically stable[8] palonosetron formulation through their claimed invention, which improved upon the prior art by recognizing and identifying the optimal combination of palonosetron, pH, excipients, and/or processing steps. (*See, e.g.*, *id.* at col. 5:3-5 ("The inventors have further discovered that by adjusting the formulation's pH and/or excipient concentrations it is possible to increase the stability of palonosetron formulations."), 5:51-53 ("The inventors have further discovered that the addition of mannitol and a chelating agent can increase the stability of palonosetron formulations."), 7:30-31 (noting that "palonosetron concentration was also a critical factor in chemical stability").) Notably, the patentees provided the real-world manifestation of their invention in the "SUMMARY OF THE INVENTION" section: "***These formulations are***

---

Amendment and Response to Office Action in Application No. 11/186,311, at 8 ("[T]he formulations of the present invention are pharmaceutically stable, when the formulations described in the Berger '333 patent most likely are not.").)

[7] *See, e.g.*, Ex. 3 at 1361, Navoban® (tropisetron) Approved Full Prescribing Information ("Shelf-Life: ***5 years***"); Ex. 4, Medicines Compendium (2002), at KYT 1079, Kytril® (granisetron) ("Kytril ampoules have a shelf-life of ***three years***."); *id.* at ZOF 2205, Zofran® (ondansetron) ("Shelf Life" "***36 months***") (emphases added).

[8] As the quote from the specification in the preceding sentence demonstrates, the inventors equated "stability" with "shelf life."

*shelf stable for periods greater than 24 months at room temperature* . . . ." (*Id.* at col. 2:59-60 (emphasis added).)

Attempting to capitalize on the success of Plaintiffs' Aloxi® product, seven generic competitors,[9] including Ben Venue and Aurobindo, now seek to market generic copies of that product before the expiration of the patents-in-suit.  Ben Venue and Aurobindo, as "subsequent filers" of an ANDA seeking FDA approval to market a generic version of Aloxi®, however, will not be able to market their respective products until the first filer's 180-day exclusivity period expires.[10]  *See* 35 U.S.C. § 355(j)(5)(B)(iv).

## THE LAW OF CLAIM CONSTRUCTION

"It is a 'bedrock principle' of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312.[11]  The words of a claim "are generally given their ordinary and customary meaning," which is the "meaning to the ordinary artisan after reading the entire patent." *Id.* at 1312, 1321.  "There are only two exceptions to this general rule:  1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1373 (Fed. Cir. 2013), *cert. granted*, No. 13-854, 2014 WL 199529 (U.S. Mar. 31, 2014).

---

[9] Since 2011, an action involving a group of "first-filing" ANDA applicants, *Helsinn Healthcare S.A., et. al. v. Dr. Reddy's Laboratories, Ltd., et. al.*, Civil Action No. 11-3962 (D.N.J.), has been pending in the District of New Jersey.  In that action, the defendants sought to construe the same claim term at issue in this case, "pharmaceutically stable," and proposed the same erroneous construction pursued by Ben Venue before this Court.  After full briefing and a hearing, Judge Cooper deferred any claim-construction ruling until trial.  In doing so, Judge Cooper expressly limited any expert testimony addressing the meaning of the "pharmaceutically stable" claim term to an analysis of the specification disclosure.  (Ex. 5, 9/7/12 Claim Constr. Hr'g Tr., at 76-77.)

[10] As noted above, two other litigations involving "subsequent" ANDA applicants seeking to market generic versions of Aloxi® are also currently pending before this Court.

[11] Unless otherwise noted, internal quotations omitted.

Where the ordinary and customary meaning is readily apparent to a person of ordinary skill in the art, a construction of "plain meaning" or "ordinary meaning" is all that is required. *See, e.g.*, *Finjan, Inc. v. Secure Computing Corp.*, No. 06-369, 2007 U.S. Dist. LEXIS 100215, at *3 n.1, *5-*8 (D. Del. Dec. 11, 2007), *aff'd*, 626 F.3d 1197, 1207 (Fed. Cir. 2010); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001).

To the extent that construction of the plain meaning is necessary, the specification "is always highly relevant. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315; *see also Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1356 (Fed. Cir. 2007) (stating that the specification, which reflected the "ordinary meaning" of the term, is "the primary resource for determining how an invention would be understood by persons experienced in the field"). Moreover, the purpose of the invention as set forth in the specification can be relevant in construing the claims. *Osram*, 505 F.3d at 1358 (finding error in a construction that was "at odds with the purposes of the invention").

The prosecution history should also be considered, as it "provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation," however, "it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id*. As such, the prosecution history can be used to deviate from the ordinary and customary meaning of a claim term only through a "clear and unmistakable" surrender of claim scope. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012).

A court may, in its discretion, also consider extrinsic evidence. *Phillips*, 415 F.3d at 1317. Courts are cautioned, however, to discount any extrinsic evidence that contradicts the intrinsic evidence, as the former is "less reliable than the patent and its prosecution history in

determining how to read claim terms." *Id.* at 1318.

## ARGUMENT

## I.   A CONSTRUCTION OF "PLAIN MEANING" IS SUFFICIENT

Ben Venue concedes that the claim term "pharmaceutically stable" has a plain meaning that is readily apparent to one of ordinary skill in the art at the time of the invention. By proposing a construction of "pharmaceutically stable" that is purportedly consistent with its plain meaning (Joint Chart at 2), Ben Venue also concedes that the intrinsic record does not support deviating from the plain meaning. *See, e.g.*, *Thorner*, 669 F.3d at 1367-68 ("Our case law is clear, claim terms must be given their plain and ordinary meaning" unless there is a "clear and explicit statement by the patentee" disavowing claim scope or acting as its own lexicographer).

At most, the parties dispute what the "plain meaning" is. Ben Venue, however, has not explained how engaging in this exercise would be pertinent to any claim or defense in this action. *See, e.g.*, *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc*., 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy."). For example, Ben Venue did not contest infringement in its notice letters, including based upon the "pharmaceutically stable" claim limitation. *See Sciele Pharma Inc. v. Lupin Ltd*., No. 09-0037 (RBK/JS), 2011 WL 4351672, *10 (D. Del. Sept. 15, 2011) (refusing to construe terms that were "immaterial to determining infringement"). The other defendant in this consolidated action, Aurobindo, does not seek to construe "pharmaceutically stable" at all, further confirming that claim construction is unnecessary.

Accordingly — and particularly given that, as explained below, there is no basis in the intrinsic record for adopting Ben Venue's flawed construction — any disagreement regarding the plain meaning can be the subject of testimony by the parties' experts, if that even becomes

necessary, and the Court's construction of "plain meaning" is sufficient.  *See, e.g.*, *Finjan*, 626

F.3d at 1207; *Mentor*, 244 F.3d at 1380.

## II.     TO THE EXTENT THE COURT DETERMINES THAT THE PLAIN MEANING REQUIRES ELUCIDATION, ONLY PLAINTIFFS' DEFINITION IS CONSISTENT WITH THE SPECIFICATION

To the extent that the Court determines that the plain meaning of "pharmaceutically

stable" requires further clarification, the Court should adopt Plaintiffs' proposed construction.

The parties' competing constructions of "pharmaceutically stable" are set forth below:

| Plaintiffs' Proposed Construction | Ben Venue's Proposed Construction |
| --- | --- |
| plain meaning, *i.e.*, shelf stable for periods greater than 24 months at room temperature | plain meaning – without significant change in chemical and physical integrity for pharmaceutical use |

### A.     The Specification Supports Plaintiffs' Definition of "Pharmaceutically Stable"

The common specification of the patents-in-suit provides the ordinary and customary

(*i.e.*, plain) meaning of "pharmaceutically stable," as that term would have been understood by

one of ordinary skill in the art at the time of the invention.  *See Phillips*, 415 F.3d at 1321

("Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan

*after reading the entire patent*.") (emphasis added); *Osram*, 505 F.3d at 1356.  Specifically, the

specification explains that "an object of the present invention [is] to provide a formulation of

Palonosetron hydrochloride with increased *pharmaceutical stability* for preventing and/or

reducing emesis."  ('724 patent, at col. 2:42-44 (emphasis added).)  The specification further

explains, in the "SUMMARY OF THE INVENTION," that this objective has been met through

the discovery of "surprisingly effective and versatile formulation[s]" that "are *shelf stable for*

*periods greater than 24 months at room temperature*, and thus can be stored without

refrigeration . . . ." (*Id*. at col. 2:57-61; *see also id.* at col. 1:13-15 ("The ***present invention*** relates to ***shelf-life stable*** liquid formulations of palonosetron that are especially useful in the preparation of injectable and oral medicaments."); Abstract ("The ***present invention*** relates to ***shelf-stable*** liquid formulations of palonosetron for reducing chemotherapy and radiotherapy induced emesis with palonosetron.") (all emphases added).)  Accordingly, based upon the specification, the ordinary and customary meaning of "pharmaceutically stable" is "shelf stable for periods greater than 24 months at room temperature."  *See, e.g.*, *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1397-98 (Fed. Cir. 2008) (defining "ordinary meaning" of claim term based upon specification statements describing the invention because, while the "use of the phrase 'the present invention' does not 'automatically' limit the meaning of claim terms in all circumstances . . . the common specification's repeated use of the phrase 'the present invention' describes the invention as a whole").

As discussed above, Plaintiffs' plain-meaning construction is also consistent with the specification's discussion of how the invention improved the prior-art palonosetron formulations by providing new palonosetron formulations that have the 1-2 years of pharmaceutical stability required by "health authorities in various countries."  ('724 patent, at col. 1:52-2:3.)  Also, as discussed above, Plaintiffs' plain-meaning construction reflects the patentees' goal of developing new palonosetron formulations with pharmaceutical stabilities that were comparable to other 5-HT$_3$ antagonists known at the time the application leading to the patents-in-suit was filed, *i.e.*, shelf stabilities greater than two years.  This discussion in the specification of how the claimed invention overcame the deficiencies of the prior art — which equates pharmaceutical stability with increased shelf life, consistent with the ordinary and customary meaning of that claim term (*id.* at col. 2:36-37) — further supports Plaintiffs' plain-meaning construction.  *See Osram*, 505 F.3d at 1358.

10

**B.**     **Ben Venue's Proposed Construction Should be Rejected**

    **1.**     **Ben Venue's Proposed Construction
Is Not Supported by the Specification**

Despite its clear disclosure and guidance, Ben Venue proposes a construction that conflicts with the specifications of the patents-in-suit. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (noting that the patent specification "is the single best guide to the meaning of a disputed term"). As a preliminary matter, Ben Venue's construction of "pharmaceutically stable" is, at most, a generic dictionary definition of the term "stable" that simply adds the words "for pharmaceutical use" at the end, rather than defining the term as a whole (*i.e.*, "stable" modified by the adjective "pharmaceutically"). Not surprisingly, Ben Venue's *ad hoc*, extrinsic evidence-based definition finds no support in, and is divorced from, the specification's disclosure.

As explained above, the specification uses the term "pharmaceutically stable" to describe the new palonosetron formulations that overcame the shortcomings of early prior-art solutions having a shelf life of "less than 1-2 year[s]." (*See, e.g.*, '724 patent, at col. 1:52-2:3.) Under Ben Venue's proposed construction, however, which does not provide any temporal guidelines, these prior-art formulations could be considered "pharmaceutically stable." Ben Venue's construction therefore ignores the *raison d'être* of the patent, and should be rejected accordingly. *See Osram*, 505 F.3d at 1358. Moreover, without any temporal guidelines, Ben Venue's construction ignores the explicit disclosure in the "SUMMARY OF THE INVENTION": "These formulations are shelf stable for periods greater than 24 months at room temperature . . . ." ('724 patent, at col. 2:59-60.)

### 2.      Ben Venue's Proposed Construction Is Impermissibly Indefinite

Ben Venue's proposed construction of "without significant change in chemical and physical integrity for pharmaceutical use" should also be rejected as indefinite.  For example, its construction does not specify for how long a given formulation has to be "without significant change in chemical and physical integrity" to be considered "pharmaceutically stable."  Thus, under Ben Venue's approach, the exact same palonosetron formulation could be both "pharmaceutically stable" and not "pharmaceutically stable" depending upon when Ben Venue's vague "without significant change" test is applied.  As another example, two formulations could be identical when manufactured, but only one considered "pharmaceutically stable" under Ben Venue's construction at a given time to the extent its identical twin was stored under harsher conditions.

The Federal Circuit has routinely rejected indefinite constructions like the one proposed by Ben Venue.  *See, e.g.*, *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (2003) ("By GSK's proposed construction, a formulation . . . *might infringe or not depending on its usage in changing circumstances*. . . .  That is the epitome of indefiniteness.") (emphasis added); *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008) ("When a proposed construction requires that an artisan make a separate infringement determination for every set of circumstances in which the composition may be used, and when such determinations are likely to result in differing outcomes (sometimes infringing and sometimes not), that construction is likely to be indefinite."); *Paragon Sol'ns, LLC v. Timex Corp.*, 566 F.3d 1075, 1090 (Fed. Cir. 2009) ("Construing a non-functional term in an apparatus claim in a way that makes direct infringement turn on the use to which an accused apparatus is later put confuses rather than clarifies, frustrates the ability of both the patentee and potential infringers to ascertain the propriety of particular activities, and is inconsistent with the notice

12

function central to the patent system."). Because Ben Venue's proposed construction would raise new legal issues, instead of resolving them, it should be rejected.

## III. THE PROSECUTION HISTORIES OF THE PATENTS-IN-SUIT ARE CONSISTENT WITH THE PLAIN MEANING OF "PHARMACEUTICALLY STABLE"

As noted above, Ben Venue asserts that its construction of "pharmaceutically stable" is the "plain meaning" of this term. (Joint Chart at 2.) Thus, Ben Venue implicitly agrees that nothing in the intrinsic record, including the prosecution histories of the patents-in-suit, indicates any intent to deviate from the plain meaning of the "pharmaceutically stable" claim term.[12]

Nevertheless, to the extent the prosecution history in this case is relied upon to determine the meaning of "pharmaceutically stable," the inventors' declaration submitted during prosecution is consistent with Plaintiffs' proposed construction of "shelf stable for greater than 24 months at room temperature." For example, in their declaration, the inventors expressly represent that "pharmaceutically stable" formulations "can be stored for ***prolonged periods of time*** in a ***variety of conditions*** without significant degradation or loss of potency." (11/21/07 Statutory Declaration of G. Calderari, D. Bonadeo, R. Cannella, E. Braglia, and R. Braglia in Application No. 11/186,311, at ¶ 6 (emphasis added).) This statement, referring to storage for "prolonged periods of time" under a "variety of conditions" in the context of the prior art, is consistent with the ordinary and customary meaning set forth in the specification, namely, shelf stability and storage "for greater than 24 months at room temperature." It is also consistent with the discussion in the specification that criticizes prior-art palonosetron formulations because of their shorter shelf stability. (*See supra* at 5, 10.)

---

[12] To the extent Ben Venue attempts to rely upon any portion of the prosecution histories to argue that any definition other than the plain meaning, as supported by the specification, should apply, only "clear and unmistakable" statements could be used to support such a deviation. *See, e.g.*, *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003).

IV.    **TO THE EXTENT EXTRINSIC EVIDENCE IS
       CONSIDERED, IT FULLY SUPPORTS PLAINTIFFS' POSITION**

Because the ordinary and customary meaning is clear from the intrinsic record, the Court need not look to extrinsic evidence.  *See Phillips*, 415 F.3d at 1319.  Nevertheless, Plaintiffs' plain-meaning definition of "pharmaceutically stable" is consistent with well-accepted industrial standards.  Outside of the claimed invention, a POSA would understand that a "pharmaceutically stable" formulation should have a shelf life of at least two years.  (*See, e.g.,* Ex. 6, Howard C. Ansel et al., Pharmaceutical Dosage Forms and Drug Delivery Systems, at 86 (7th ed. 1999) ("Under usual circumstances, most manufactured products require a shelf-life of 2 or more years to ensure their stability at the time of patient consumption.").)  This general understanding of a necessary shelf-life of greater than 24 months at room temperature would be particularly recognized where, as here, all of the previously known products in the relevant field of treatment had shelf lives meeting this standard.  (*See supra* at n.7.)

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court either provide a construction of "plain meaning" for the "pharmaceutically stable" limitation or adopt Plaintiffs' proposed "plain meaning" construction, *i.e.*, "shelf stable for periods greater than 24 months at room temperature."

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Maryellen Noreika*

_____

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Plaintiffs Helsinn Healthcare S.A. and Roche Palo Alto LLC*

OF COUNSEL:

Joseph M. O'Malley, Jr.
Bruce M. Wexler
Eric W. Dittmann
David M. Conca
Gary Ji
Angela C. Ni
PAUL HASTINGS LLP
75 East 55th Street
New York, NY 10022
(212) 318-6000

*Attorneys for Plaintiff
Helsinn Healthcare S.A.*

Mark E. Waddell
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
(212) 407-4127

*Attorneys for Plaintiff
Roche Palo Alto LLC*

April 17, 2014

8181060.1

15

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 17, 2014, I caused the foregoing to be electronically

filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all

registered participants.

I further certify that I caused copies of the foregoing document to be served on

April 17, 2014, upon the following in the manner indicated:

| | |
|---|---|
| Mary B. Matterer, Esquire<br>Richard K. Herrmann, Esquire<br>MORRIS JAMES LLP<br>500 Delaware Avenue, Suite 1500<br>Wilmington, DE  19801-1494<br>*Attorneys for DefendantsAurobindo Pharma*<br>*Ltd. and Auromedics Pharma LLC* | *VIA ELECTRONIC MAIL* |
| H. Keeto Sabharwal, Esquire<br>Nirav N. Desai, Esquire<br>Brett E. Howard, Esquire<br>Paul A. Ainsworth, Esquire<br>STERNE, KESSLER, GOLDSTEIN & FOX PLLC<br>1100 New York Avenue<br>Washington, DC  20005<br>*Attorneys for DefendantsAurobindo Pharma*<br>*Ltd. and Auromedics Pharma LLC* | *VIA ELECTRONIC MAIL* |
| Karen E. Keller, Esquire<br>David M. Fry, Esquire<br>SHAW KELLER LLP<br>300 Delaware Avenue, Suite 1120<br>Wilmington, DE  19801<br>*Attorneys for Defendant Ben Venue*<br>*Laboratories, Inc. d/b/a Bedford Laboratories* | *VIA ELECTRONIC MAIL* |
| Robert V. Cerwinski, Esquire<br>Huiya Wu, Esquire<br>Michael S. Chang, Esquire<br>KENYON & KENYON LLP<br>One Broadway<br>New York, NY  10004<br>*Attorneys for Defendant Ben Venue*<br>*Laboratories, Inc. d/b/a Bedford Laboratories* | *VIA ELECTRONIC MAIL* |

1

William G. James, Esquire                          *VIA ELECTRONIC MAIL*
KENYON & KENYON LLP
1500 K Street, NW
Washington, DC  20005
*Attorneys for Defendant Ben Venue*
*Laboratories, Inc. d/b/a Bedford Laboratories*


*/s/ Maryellen Noreika*

---

Maryellen Noreika (#3208)