**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| HELSINN HEALTHCARE S.A. and ROCHE PALO ALTO LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:13-cv-00688-GMS CONSOLIDATED |
| AUROBINDO PHARMA LTD. and AUROBINDO PHARMA LLC, | ) ) ) | |
| Defendants. | ) ) | |
| HELSINN HEALTHCARE S.A. and ROCHE PALO ALTO LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:14-cv-00427-GMS (All documents filed in 13-688) |
| CIPLA LTD. and CIPLA USA, INC. | ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS CIPLA LTD. AND CIPLA USA, INC.'S
CORRECTED* ANSWERING CLAIM CONSTRUCTION BRIEF**

*Of Counsel:*
Robert F. Green
Caryn C. Borg-Breen
John P. Snow
Jessica M. Tyrus
LEYDIG, VOIT & MAYER, LTD.
Two Prudential Plaza, Suite 4900
180 North Stetson
Chicago, Illinois 60601-6731
Voice: (312) 616-5600
Facsimile: (312) 616-5700

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pgslaw.com
dab@pgslaw.com
*Attorneys for Defendants Cipla Ltd. and Cipla USA, Inc.*

Dated: January 27, 2015

* Defendants Cipla Ltd. and Cipla USA, Inc. submit this Corrected Brief to correct citations to conform to the exhibits referenced in the Joint Appendix of Intrinsic Evidence (D.I. 128).

## **TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................................ 1

II.   ARGUMENT................................................................................................................... 2

      A.    Plaintiffs Ignore the Repeated and Numerous Statements to the PTO and the
            Public that the Scope of the Invention is Limited to Only Formulations Having
            a pH of From 4.0 to 6.0........................................................................................ 2

      B.    Plaintiffs' Arguments that the '219 Patent Preamble Term is Limiting Lack
            Basis in Both the Law and the Facts.................................................................... 7

III.  CONCLUSION............................................................................................................. 10

## TABLE OF AUTHORITIES

**Cases**

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
 388 F.3d 858 (Fed. Cir. 2004) ........................................................................................ 6

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
 289 F.3d 801 (Fed. Cir. 2002) ................................................................................... 7, 10

*JobDiva, Inc. v. Monster Worldwide, Inc.*,
 Civil Action No. 13-cv-8229 (KBF), 2014 WL 5034674 (S.D.N.Y. Oct. 3, 2014) ................... 8

*Micron Technology, Inc. v. Tessera, Inc.*,
 440 F. Supp. 2d 591 (E.D. Tex. 2006) ............................................................................. 8

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
 357 F.3d 1340 (Fed. Cir. 2004) ...................................................................................... 6

*Netword, LLC v. Centraal Corp.*,
 242 F.3d 1347 (Fed. Cir. 2001) ...................................................................................... 6

*Rothschild v. Cree*,
 567 F. Supp. 2d 572 (S.D.N.Y. 2008) ............................................................................. 8

## I.      INTRODUCTION

Plaintiffs ask this Court to construe the term "said formulation is stable at 24[18] months when stored at room temperature" broadly such that it encompasses formulations of palonosetron that are clearly outside the scope of Plaintiffs' invention.  In order to support this broad construction, Plaintiffs ask this Court to ignore the inventors' own statements to the PTO, and hence, the public, which describe in detail the story of how they allegedly discovered improved stability of palonosetron formulations through their selection of a pH range of from 4.0 to 6.0. Rather, Plaintiffs rely on attorney argument, made after the initiation of litigation concerning the patents-in-suit, to support their argument.  Plaintiffs should not be allowed to expand the scope of the claims beyond the scope of their invention based solely on attorney argument that theoretically implies that pH is not the only variable that can be used to increase stability of a palonosetron formulation.  Accordingly, Cipla requests that this Court construe the stability terms of the '219 and '094 patents as requiring that the formulations have a pH of from 4.0 to 6.0.

With respect to the preamble term "for intravenous administration to a human to reduce the likelihood of cancer chemotherapy-induced nausea and vomiting," Plaintiffs have failed to provide a convincing basis for their argument that the entirety of the preamble of the '219 patent claims should be construed as a limitation of the claims.  Accordingly, Cipla requests that this Court find that the portion of the preamble relating to the mode of administration and intended treatment is not limiting.

## II.    ARGUMENT

### A.    Plaintiffs Ignore the Repeated and Numerous Statements to the PTO and the Public that the Scope of the Invention is Limited to Only Formulations Having a pH of From 4.0 to 6.0

| Claim Language | Plaintiffs' Construction | Cipla's Construction |
|---|---|---|
| said formulation is stable at 24[18] months when stored at room temperature | plain meaning | said formulation has a pH that enables said formulation to be stable for 24[18] months when stored at room temperature, wherein the pH is from 4.0 to 6.0<br><br>"stable" means without significant change in chemical and physical integrity |

As set forth at length in Cipla's Opening Claim Construction Brief (D.I. 121, "Cipla's Opening Brief"), the '219 and '094 patentees made numerous and repeated statements throughout the prosecution of the ancestor '724, '725, and '424 patents that limit the scope of the allegedly inventive palonosetron formulations to those having a pH of from 4.0 to 6.0. Plaintiffs attempt to divert this Court's attention from these statements by premising much of their argument against incorporating a pH limitation into the claims of the '219 and '094 patents on the theory that pH is only one variable that can be used to allegedly increase stability in the claimed palonosetron formulations. *See* Plaintiffs' Opening Claim Construction Brief (D.I. 119, "Plaintiffs' Opening Brief") at pp. 1, 3, 7. As Cipla predicted in its Opening Brief, Plaintiffs point to statements made in the common specification of the '219 and '094 patents that, when read in isolation, seem to indicate that certain excipients—namely, mannitol and EDTA—can be used to improve stability of palonosetron formulations, regardless of the pH of those formulations. *Id.* However, the common specification provides absolutely no guidance concerning how to achieve the desired stability through modification of excipient concentrations in a formulation having a pH outside the range of 4 to 6. In addition, Plaintiffs' argument should be ignored because the weight of the intrinsic evidence, based on the patentees' repeated

2

statements to the PTO, including statements made in declarations by the inventors themselves, indicates that any alleged discovery by the patentees concerning stability of the claimed palonosetron formulations was made only in formulations that have a pH of 4.0 to 6.0.  Thus, this Court should construe the stability terms of the '219 and '094 patents as requiring that the claimed formulations have a pH of from 4.0 to 6.0, as proposed by Cipla.

When the inventors were confronted by prior art that disclosed each and every limitation of the claims pending during the prosecution of the '724, '725, and '424 ancestor patents, which occurred concurrently in 2008-2011, and when the Examiner asserted that the inventors' claimed formulations were the result of mere routine optimization, the inventors told the PTO an elaborate story of the inventors' allegedly novel and non-obvious discovery, as follows.

First, the inventors repeatedly stressed the importance of each recited element of the pending claims (i.e., palonosetron concentration, pH, EDTA, and mannitol), arguing that it was this particular inter-dependent and cooperative combination that defined the inventors' discovery:

- "It is the particular combination of features recited in Applicant's claims, arrived at after a particular sequence of studies, that defines 'the invention as a whole,' and that must be evaluated for purposes of patentability." J.A.241.
- "While the various features of the claims can be found individually in the prior art, the claimed invention is premised on the combination and inter-cooperation of several features." *Id.*
- "The number of elements in this combination – and their inter-dependency – is also significant.  The record demonstrates . . . that all elements must be carefully balanced to arrive at a stable formulation." J.A.259.

3

- "[T]he elements of the formulation cooperate in an inter-dependent manner to produce a highly stable formulation." J.A.152. *See also* J.A.241.

Then, the inventors went on to painstakingly describe the importance of the sequence of the inventors' discoveries, and how each step of their discovery influenced the next one—first, pH selection, followed by the determination of mannitol and EDTA concentration:

- "[T]he claimed formulation was discovered after a sequence of experiments, each building on the prior experiment like a series of building blocks to arrive at the claimed invention." J.A.113-J.A.114. *See also* J.A.089-J.A.090 at ¶¶ 10-13.

The inventors even went so far as to explicitly tell the PTO that the scope of their discovery was limited to formulations that have a pH of from 4.0 to 6.0:

- "Applicant has discovered that mannitol results in a more stable formulation, but this discovery was only made in the context of an aqueous formulation at a pH of 4-6 using palonosetron HCl." J.A.152-J.A.153. *See also* J.A.241-J.A.242.

- "Applicant has discovered that EDTA stabilizes the formulation, but it only does so at low concentrations of palonosetron HCl in an aqueous formulation of palonosetron HCl having a pH of 4-6." J.A.152-J.A.153.

Indeed, the inventors stated that "[a] different formulation could have been obtained at any step along the way if the experimental sequence had differed," and elaborated with a specific example, indicating the importance of the formulation's pH of from 4.0 to 6.0: "For example, Applicant discovered that mannitol is the best tonicity agent for the formulation, but this discovery was only made after the inventors had settled on an aqueous formulation, using palonosetron HCl at a pH of 4-6." J.A.114.

4

Lastly, during the course of the prosecution of the '724, '725, and '424 ancestor patents,

the inventors submitted two declarations[1] to the PTO to overcome two pieces of prior art used in

anticipation rejections.  In these declarations, to overcome anticipation rejections based on the

Baroni and Macchiocci references (i.e., WO 2004/073714 and WO 2004/045615, respectively),

the inventors focused exclusively on the formulation set forth in Example 4 of the common

specification shared by the '724, '725, and '424 patents, which has a pH of 5.0 ± 0.5.  *See*

J.A.067- J.A.068 at ¶¶ 8-10, 12, 15, 16; J.A.073- J.A.075 at ¶¶ 12-14, 16, 18, 24-26.  While the

second of these two declarations is broader in scope than the first, both declarations are clear in

their focus on Example 4—and on formulations having a specific pH of from 4.0 to 6.0.  Indeed,

all of the inventors declare that their discovery rested on understanding "the effect that variations

in palonosetron concentration, pH, and excipient concentrations" had on the stability of the

formulation set forth in Example 4.  *See* J.A.074 at ¶ 18.

Despite these clear statements by the inventors, Plaintiffs attempt to rewrite the story of

the invention and avoid their earlier statements to the PTO.  In 2013, years after these statements

were made, and only after litigation concerning Aloxi® had commenced[2] and it became apparent

to Plaintiffs that an ANDA filer may be able to design-around the asserted patents by using a pH

outside the range of from 4.0 to 6.0,[3] Plaintiffs argued for the first time that their alleged

---

[1] The first declaration was submitted only by inventor Bonadeo, and the second declaration was submitted by all living named inventors.
[2] The first filers' litigation in the District of New Jersey commenced on July 8, 2011, after Notices of Allowance had already issued with respect to the '724, '725, and '424 patents.
[3] Contrary to Plaintiffs' assertion that Cipla is attempting to "manufacture a noninfringement argument" (*see* Plaintiffs' Opening Brief at p. 1), Cipla has instead invested time and money to "design around" the claims of the asserted patents on the basis of the patentees' clear and unequivocal representations to the PTO (and the public) concerning the scope of their alleged invention.  *See, e.g.*, *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000).

invention was not premised on having a specific pH of from 4.0 to 6.0. Indeed, the Examiner

interview held during the prosecution of the '219 patent in 2013 (after litigation had

commenced), as cited by Plaintiffs in their Opening Brief, is the only place where Applicants

attempted to argue to the PTO that a certain pH is not needed to achieve the claimed stability.

*See* Plaintiffs' Opening Brief at p. 8. This Court should not be swayed by Plaintiffs' litigation-

driven attempt to claim more than what they actually invented on the basis of a lone statement

made by the patentees to the PTO. Rather, this Court should focus on the years of statements by

the inventors to the PTO, well-before any litigation began, which reveal the true scope of the

invention. *See, e.g.*, *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004);

*Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001).

Plaintiffs attempt to avoid these repeated statements made by the inventors to the PTO by

arguing they were made only because the claims at issue expressly contained a pH limitation.

*See* Plaintiffs' Opening Brief at p. 8. But this argument fails because none of the inventors'

statements are qualified in any way that would suggest they were intended to apply to only

certain embodiments of the claimed formulations. Rather, the inventors' statements are broad

and all-encompassing: "Applicant has discovered that mannitol results in a more stable

formulation, but this discovery was only made in the context of an aqueous formulation at a pH

of 4-6 using palonosetron HCl." J.A.152- J.A.153. *See also* J.A.241- J.A.242. And Plaintiffs

cannot argue that it is inappropriate to consider these statements simply because they were made

in earlier applications because Plaintiffs themselves have argued it is appropriate to look at the

prosecution histories of ancestor applications when construing claim terms. *See* Plaintiffs'

Opening Brief at p. 11, n.12. *See also Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340,

1350 (Fed. Cir. 2004).

The words of the inventors are clear—the inventors discovered an allegedly stable palonosetron formulation, but only one that has a pH of 4.0-6.0. These clear and unequivocal statements should direct this Court to construe the stability terms of the '219 and '094 patents as requiring that the formulations have a pH of from 4.0 to 6.0.

**B.     Plaintiffs' Arguments that the '219 Patent Preamble Term is Limiting Lack Basis in Both the Law and the Facts**

| Claim Language | Plaintiffs' Construction | Cipla's Construction |
|---|---|---|
| for intravenous administration to a human to reduce the likelihood of cancer chemotherapy-induced nausea and vomiting | plain meaning | not a limitation of the claims; if found to be a limitation of the claims, plain meaning |

Plaintiffs' primary argument, that the preamble of the claims of the '219 patent is limiting because it serves as antecedent basis for "said formulation" (*see* Plaintiffs' Opening Brief at pp. 10-11), misses the mark. Cipla has accounted for the antecedent basis of "said formulation" by agreeing that a portion of the preamble of claim 1 of the '219 patent is limiting and explaining that the remainder is not. Namely, Cipla agrees that the portion of the preamble phrase "[a] pharmaceutical single-use, unit-dose formulation" is limiting, as it forms the antecedent basis for the phrase "said formulation." However, because the remainder of the preamble merely describes the alleged invention's purpose or intended use, this portion is not limiting. *See, e.g., Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).

Plaintiffs attempt to argue that because Cipla "concedes" that a portion of the preamble is limiting, then the rest of the preamble must also be limiting. *See* Plaintiffs' Opening Brief at p. 11. This argument makes no logical sense, and is contradicted by the case law of several courts. Numerous courts have discussed that "there is no legal principle requiring that a preamble . . . be construed as an undifferentiated whole. Claim construction often requires parsing language into

separate pieces." *JobDiva, Inc. v. Monster Worldwide, Inc.*, Civil Action No. 13-cv-8229 (KBF), 2014 WL 5034674 (S.D.N.Y. Oct. 3, 2014).  For example, in an analogous situation in *Micron Technology, Inc. v. Tessera, Inc.*, the Eastern District of Texas found only a portion of a preamble limiting, where the remainder of the preamble "describes the claimed invention's purpose or intended use, rather than describing essential structure."  440 F. Supp. 2d 591, 597 (E.D. Tex. 2006).  Additionally, the Southern District of New York recognized that portions of a preamble may be limiting, while other portions may not be limiting, where at no time during the prosecution of the claims at issue did the patentee rely on that latter portion of the preamble to distinguish the claimed invention from the prior art.  *Rothschild v. Cree*, 567 F. Supp. 2d 572, 578 (S.D.N.Y. 2008).  Thus, in the present instance, because the portion of the preamble "for intravenous administration to a human to reduce the likelihood of cancer chemotherapy-induced nausea and vomiting" does not describe essential structure, but merely describes the claimed invention's purpose or intended use, and was not relied on during prosecution to distinguish the claimed invention from the prior art, it is entirely appropriate to construe only a portion of the preamble as limiting.

To bolster their weak "antecedent basis" argument, Plaintiffs look to the prosecution histories of the related ancestor '724 and '424 patents and argue that the patentees added the word "intravenous" to the preambles of the claims during prosecution in both instances. According to Plaintiffs, the patentees therefore evidenced an intent to rely on the term "intravenous" to overcome the prior art and make the preamble in the '219 patent limiting.  *See* Plaintiffs' Opening Brief at p. 11.  Plaintiffs' argument, however, ignores the different nature of the preamble phrases at issue.

**'724 and '424 Preamble**
**A pharmaceutically stable isotonic <u>intravenous</u> solution of**
**palonosetron hydrochloride** for reducing emesis or reducing the
likelihood of emesis

**'219 Preamble**
**A pharmaceutical single-use, unit dose formulation** for
<u>intravenous</u> administration to a human to reduce the likelihood of
cancer chemotherapy-induced nausea and vomiting.

As can be seen in the above comparison, the portion of the preamble in the '724 and '424

patents that serves as antecedent basis for "said formulation" contains the word "intravenous,"

and as a result, "intravenous" limits the claims of the '724 and '424 patents.  However, the

portion of the preamble in the '219 patent that serves as antecedent basis for "said formulation"

does not contain the word "intravenous," as the word "intravenous" in the '219 preamble phrase

appears in the non-limiting statement of intended use.  Had the '219 preamble been written as

"[a] pharmaceutical single-use, unit dose *intravenous formulation*," then perhaps Plaintiffs

argument would merit attention.  However, given the differences between the preamble of the

'724 and '424 patents and the preamble of the '219 patent, Plaintiffs argument fails.

Plaintiffs also argue that the use of word "isotonic" in the body of the claims of the '219

patent makes clear that the word "intravenous" is a limitation on the claim because, according to

Plaintiffs, all intravenous solutions must be isotonic.  *See* Plaintiffs' Opening Brief at p. 14.

Such a statement employs faulty logic.  It is simply not true that all intravenous solutions must be

isotonic.  *See, e.g.*, D.I. 132, Ex. I at p. 497 ("Although it is the goal for every injectable product

to be isotonic with physiologic fluids, this is not an essential requirement for small volume

injectables administered intravenously.") and D.I. 132, Ex. J (indicating that intravenous fluids

can be isotonic, hypertonic, or hypotonic).  It is also not true that all isotonic solutions need to be

9

used intravenously.  Thus, the inclusion of the word "isotonic" in the body of the claims does not support Plaintiffs' argument that the word "intravenous" in the preamble must be limiting.

Lastly, Plaintiffs can only point to a single comment made in a summary of an Examiner interview held during the prosecution of the '219 patent where the patentee's attorney mentioned the phrase "cancer chemotherapy-induced nausea and vomiting."  *See* Plaintiffs' Opening Brief at p. 14.  This single, offhand remark falls far short of the requirement in *Catalina*, which instructs that the preamble must be clearly and unmistakably relied on to distinguish the prior art. 289 F.3d at 808.  Merely mentioning "cancer chemotherapy-induced nausea and vomiting" along with a list of the other elements of the then-pending claims—i.e., concentration of palonosetron, dose of palonosetron, concentration of EDTA, concentration of mannitol, and the 24 month and 18 month stability requirements—does not meet this rigorous standard.

Accordingly, because the body of the claims of the '219 patent defines a structurally complete invention and Plaintiffs have offered no convincing basis for interpreting the entire preamble as a limitation of the claims of the '219 patent, this Court should find that the portion of the preamble "for intravenous administration to a human to reduce the likelihood of cancer chemotherapy-induced nausea and vomiting" is not limiting.

III.    CONCLUSION

For all of the foregoing reasons and the reasons set forth in Cipla's Opening Claim Construction Brief, Cipla respectfully requests that this Court adopt Cipla's claim constructions proposed herein.

Respectfully submitted,

Dated:  January 27, 2015

/s/ John C. Phillips, Jr.
John C. Phillips, Jr. (No. 110)
David A. Bilson (No. 4986)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806-4204
Voice:              (302) 655-4200
Facsimile          (302) 655-4210
JCP@pgslaw.com
DAB@pgslaw.com

Of Counsel:

Robert F. Green
Caryn C. Borg-Breen
John P. Snow
Jessica M. Tyrus
LEYDIG, VOIT & MAYER, LTD.
Two Prudential Plaza, Suite 4900
180 North Stetson
Chicago, Illinois 60601-6731
Voice:         (312) 616-5600
Facsimile:     (312) 616-5700
rgreen@leydig.com
cborg-breen@leydig.com
jsnow@leydig.com
jtyrus@leydig.com

*Attorneys for Defendants Cipla Ltd. and
Cipla USA, Inc.*

11